SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
JUSTICE DOUGHERTY
*221 Appellants, the Philadelphia Parking Authority (PPA) and the Pennsylvania Public Utility Commission (PUC), appeal from the order of the Commonwealth Court invalidating a jurisdictional agreement between PPA and PUC and concluding certain PPA regulations are invalid and unenforceable as to partial rights taxicabs operating in the City of Philadelphia (City). We reverse the Commonwealth Court's order in part (with regard to amended Count IV of the Amended Petition for Review), and affirm it in part (with regard to Counts V-VIII).
Appellees are suburban common carriers which, pursuant to certificates of public convenience, are authorized to provide hail or call taxicab services, known in the industry as "call or demand services," in the Commonwealth. Appellees are also authorized to provide call or demand services in limited portions of the City, while being prohibited from providing call or demand service to the City's business or tourist districts, Philadelphia International Airport, 30th Street Station, or City casinos. Taxicabs which are authorized to provide call or demand service throughout the City are known as "medallion taxicabs," while appellees operate what are known as "partial rights taxicabs." Prior to 2004, PUC was responsible for regulating all taxicab service in the Commonwealth. Medallion taxicabs were regulated pursuant to the Medallion Act, 66 Pa.C.S. §§ 2401 - 2416 (repealed), and all other taxicabs, including those operated by appellees, were regulated pursuant to the Public Utility Code, 66 Pa.C.S. §§ 101 - 3316, and PUC regulations. In 2004, the General Assembly passed Act 94,[1] which repealed the Medallion Act, and substantially reenacted Chapter 57 of the Parking Authorities Law, 53 Pa.C.S. §§ 5701 - 5745. Act 94 transferred jurisdiction over and regulation of medallion taxicab service within the City from PUC to PPA. PUC retained jurisdiction over the regulation of taxicabs with PUC certificates in all other parts of the Commonwealth, and PUC and PPA were granted dual jurisdiction over partial rights taxicabs. The General Assembly recognized Act 94 created a jurisdictional overlap within the City with regard to partial rights taxicabs. Accordingly, in Section 22(4) of Act 94,[2] the General Assembly *222 provided PUC and PPA the power to resolve by mutual agreement any jurisdictional issues that may be associated with that overlap.
In February 2005, PUC and PPA entered into a Jurisdictional Agreement, which was published in the Pennsylvania Bulletin on March 12, 2005, along with the PUC order ratifying the Jurisdictional Agreement. See 35 Pa. B. 1737 (2005). The Jurisdictional Agreement provides, in relevant part:
2. Partial Authority Taxicabs
Currently, there are carriers authorized to provide taxicab service to designated areas within [the City] on a non-city wide basis. Section 11 of Act 94[, 53 Pa.C.S. § 5714,] provides that the PPA has jurisdiction over these carrier's [sic] operations within [the City]. These carriers also hold authority from the [PUC] to serve designated areas outside [the City]. The [PUC] and the PPA agree that services provided under dual authority to/from points within the PPA authorized area (in [the City] ) to/from points within the [PUC] authorized area (outside [the City] ), will be regulated by the PPA.
Id. Pursuant to Act 94, PPA first promulgated and began enforcing taxicab regulations in 2005.[3] In 2011, PPA promulgated the regulations at issue in this appeal pursuant to the Regulatory Review Act, 71 P.S. §§ 745.1 - 745.14, and the Commonwealth Documents Law, and the regulations became effective on December 3, 2011 (the 2011 regulations).
In November 2011, appellees filed a twelve count Petition for Review in the Commonwealth Court's original jurisdiction, challenging PPA's regulation of partial rights taxicabs and seeking, in part, declaratory and injunctive relief. On December 22, 2011, Judge Butler denied injunctive relief. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Dec. 22, 2011). Following four years of additional litigation, Counts II and IV-VIII remained.[4] Count II sought a declaration *223 PPA failed to comply with Section 5702 of Act 94, 53 Pa.C.S. § 5702, which required PPA to submit proposed regulations to the City of the First Class Taxicab and Limousine Advisory Committee (Advisory Committee), when promulgating the 2011 regulations. Count IV challenged the Jurisdictional Agreement to the extent it affects the application and manner of enforcement of PPA's regulations regarding partial rights taxicabs. Specifically, Count IV asserted the Jurisdictional Agreement is invalid because it (1) violates Act 94, (2) violates appellees' rights to due process, and (3) violates appellees' rights to equal protection generally and under the Uniformity Clause of the Pennsylvania Constitution.[5] The remaining counts sought to invalidate PPA's regulations relating to mileage limitations, 52 Pa. Code § 1017.4(a)[6] (Count V), inspections and vehicle partitions, 52 Pa. Code §§ 1017.2, 1017.32(d) ; 1017.31 ; 1017.5(b)(12), 1017.21(b)[7] (Count VI), driver certification standards, 52 Pa. Code §§ 1021.2, 1021.4(3), 1021.4(7), 1021.7, 1021.8, and 1021.9[8] (Count VII), and annual renewal of rights and out-of-service designations, 52 Pa. Code §§ 1003.32, § 1011.3[9] (Count VIII), on the grounds the regulations were *224 not within PPA's statutory authority and violated appellees' substantive and procedural due process rights.
In October 2015, Judge Brobson conducted a two-day non-jury trial, framing the issues to be decided as follows:
1. With respect to Count II of the Amended Petition for Review, whether the [PPA] failed to comply with 53 Pa.C.S. § 5702 when promulgating its current regulations (published on December 3, 2011)?[10]
2. With respect to amended Count IV of the Amended Petition for Review, whether the Jurisdictional Agreement between the [PPA] and the PUC should be declared invalid because it violates: (a) Act 94, (b) [appellees'] rights to due process and equal protection under the United States and Pennsylvania Constitutions, or (c) the Uniformity Clause of the Pennsylvania Constitution?
3. With respect to Counts V through VIII of the Amended Petition for Review, whether the [PPA's] regulation of vehicle mileage limits, vehicle inspections, and vehicle partitions, and driver certification and its regulations relating to annual renewal and out-of-service designations exceed the [PPA's] statutory powers and/or violate [appellees'] substantive due process rights. Within this main issue, [appellees] advance global challenges -- i.e , challenges that apply to all of the challenged regulations -- and challenges specific to each regulation.
Bucks County Servs. Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op., at 2-3.[11]
In November 2016, the court issued an unpublished order and opinion containing numerous findings of fact and conclusions of law. With regard to Count IV (application of the Jurisdictional Agreement), the court made the following findings of fact. The court acknowledged appellees, PPA, and PUC each called witnesses at trial to testify as to the proper interpretation and application of the Jurisdictional Agreement to certain trips and yet none of these witnesses could agree on which taxicabs trips would be regulated by each agency. Id. at 6-10, Finding of Fact (FOF) No. 13. The court found the lack of consistency in witnesses' testimony showed the Jurisdictional Agreement does not clearly designate when appellees will be subject to each agency's jurisdiction, it is impossible for appellees to determine when their taxicabs are required to be in compliance with each agency's regulations, it does not clearly and adequately define when appellees' taxicabs must be listed on Form PR-1[12] or which taxicabs are subject to the payment of annual assessments, and which taxicabs must be inspected by PPA or be subject to possible enforcement stops and/or impoundment.
*225 Id. at 10-11, FOF Nos. 14-17. The court found the Jurisdictional Agreement, as applied to appellees, "is unclear, vague, and inadequate and, therefore, unreasonable" because it does not clearly define which entity regulates partial rights taxicab operations in the City and it creates uncertainty as to which taxicab operations are regulated by each agency. Id. at 11, FOF No. 18.
The court further noted Section 5714(c) of Act 94 granted PPA the power to regulate any taxicab operations that start and/or end in the City and that the Jurisdictional Agreement did not affect this power. Id. at 40. Thus, the court concluded appellees' claim the Jurisdictional Agreement violates Act 94 because it transfers power to regulate taxicab service outside the City from PUC to PPA lacked merit. Id. Next, the court concluded nothing in Section 5722 or anywhere else in Act 94 requires PPA to adopt PUC's existing regulations for partial rights taxicabs or to work with PUC to develop one consistent set of regulations for partial rights taxicabs because PPA is empowered to use its discretion to adopt regulations applicable to partial rights taxicabs. Id. at 41-42, citing 53 Pa.C.S. § 5722 ("The [PPA] may prescribe such rules and regulations as it deems necessary to govern the regulation of taxicabs within cities of the first class under this chapter...."). The court determined the purpose of the Jurisdictional Agreement was to decide which entity will regulate where both are authorized to regulate under Act 94. Id. at 42.
The court then addressed appellees' argument the Jurisdictional Agreement, as applied by PPA and PUC, violates their substantive due process rights because the Jurisdictional Agreement is confusing and creates uncertainty regarding which taxicabs must be listed on the PR-1, which taxicabs are subject to the payment of annual assessments, and which taxicabs must be inspected by PPA or be subject to a possible enforcement stop and/or impoundment. The court determined PUC's issuance to appellees of certificates of convenience, which provide partial rights to operate within designated areas of the City, is akin to issuance of a license to practice a profession and appellees therefore have a protected property interest in operating within the City such that any regulation must be "rationally related to a legitimate state interest." Id. at 45-46, quoting Khan v. State Bd. of Auctioneer Examiners , 577 Pa. 166, 842 A.2d 936, 947 (2004) ; see also Dranzo v. Winterhalter , 395 Pa.Super. 578, 577 A.2d 1349, 1355 (1990), appeal denied, 526 Pa. 648, 649, 585 A.2d 468, 469 (Pa. 1991) (law purporting to be exercise of police power must not be arbitrary or unreasonable). The court further concluded the Jurisdictional Agreement is subject to the same substantive due process analysis as other statutes or regulations because the Jurisdictional Agreement emanates from Act 94 and attempts to prescribe how Act 94 will be administered with respect to partial rights taxicabs. Id. at 46. The court opined "[t]he Jurisdictional Agreement, as it relates to partial rights taxicabs, is unclear, vague, and inadequate and, therefore, unreasonable because it does not clearly define which entity, either PUC or the [PPA], will regulate partial rights taxicab operations in the City." Id. at 46-47. In making this determination, the court relied upon its finding the testimony regarding application of the Jurisdictional Agreement to particular trips was inconsistent, and appellees had established the Jurisdictional Agreement did not clearly define for appellees or the regulating authorities when partial rights taxicabs will be subject to regulation by which agency; the court concluded the Jurisdictional Agreement violates appellees' substantive due process *226 rights and entered judgment in favor of appellees on Count IV.[13] Id. at 47-48; Bucks County Servs. Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), order at ¶ 2.
With regard to PPA's 2011 regulations (challenged by appellees in Counts V - VIII), the court made the following findings. There are material differences between the operations of medallion taxicabs and partial rights taxicabs. Id. at 16, FOF No. 43. Medallion taxicabs derive their authority to operate from a medallion specifically issued to each authorized taxicab, while partial rights taxicabs derive their authority from a certificate of convenience issued to an entity wishing to provide taxicab service within the City on a non-citywide basis. Id. at 17, FOF No. 43(c), (d). Appellees are required to pay an assessment on each taxicab intended to operate in the City and PPA does not take into account the amount of time each cab actually spends providing service in the City or the revenue it generates therefrom. Id. at 17, FOF No. 43(e). The court further found (1) partial rights taxicab drivers are required to attend PPA training, parts of which have nothing to do with service provided by partial rights taxicabs, and (2) partial rights taxicabs, unlike medallion cabs, are required to purchase and install their own meters, which cannot be remotely updated by PPA to apply the in-city fuel surcharge like medallion cab meters, resulting in partial rights taxicabs requiring re-inspection if the drivers manually update the meter. Id. at 17-18, FOF Nos. 43(g) - 43(h). Medallion taxicab owners are given a property interest in their medallions, which can be used as collateral to obtain a loan to raise capital to comply with PPA regulations, but partial rights taxicab owners have no property interests in their certificates of convenience and cannot use them as collateral. Id. at 18, FOF No. 43(i). Moreover, medallion cabs accrue mileage at a slower rate because they operate in more congested areas and partial rights taxicabs accrue mileage faster by operating in suburban areas. Id. at 18, FOF No. 43(j). Finally, the court found PPA's bi-annual inspection procedures are designed to handle the inspection of individual medallion taxicabs but not a whole fleet of partial rights taxicabs. Id. at 19, FOF No. 43(k).
The court further ruled PPA's vehicle mileage regulations were arbitrary as they did not bear any relationship to the vehicle standards. Id. at 19, FOF No. 45. The court also ruled the regulations relating to driver certification were unreasonable and burdensome as applied to appellees because, inter alia, the applicant waiting period was too long and some of the content of driver training was irrelevant to appellees. Id. at 20, FOF No. 47. The court *227 determined the regulations relating to partitions in appellees' cabs were unreasonable because the partitions did not protect the drivers as intended, were a safety hazard to passengers, and inhibited both driver and passenger comfort and communication. Id. at 20-21, FOF No. 48.
The Commonwealth Court analyzed appellees' challenges to the 2011 regulations to determine whether promulgation of the regulations exceeded PPA's statutory authority.[14] See Id. at 2-3. The court recognized regulations adopted pursuant to legislative rulemaking authority are valid if they are: "(a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." Id. at 35, quoting Tire Jockey Serv., Inc. v. Dep't Envtl. Prot. , 591 Pa. 73, 915 A.2d 1165, 1186 (2007) (the " Tire Jockey test").[15] The court also noted that in evaluating the reasonableness of an agency's actions, it may reverse an agency determination only if it was made in bad faith, constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties. Id. at 36, citing Rohrbaugh v. PUC , 556 Pa. 199, 727 A.2d 1080, 1085 (1999) (policy allowing shutoff of utilities at tenant's request absent signed agreement from landlord authorizing service to be automatically transferred into landlord's name was not arbitrary or unreasonable because to hold otherwise would require utilities to provide service to non-ratepayer). The court reasoned PPA's failure to take into account the differences between medallion and partial rights taxicabs by applying a single set of regulations to both was unreasonable because it imposed a disproportionate regulatory and financial burden on partial rights taxicabs. Id. at 37. The court observed partial rights taxicabs serve a materially different clientele within a materially different geographical footprint and operational model (fleet vs. medallion). Id. The court concluded it was *228 unreasonable and capricious for PPA to ignore these material differences when it promulgated the challenged regulations. Id. The court noted PPA did not present any witnesses or other evidence to explain the rationale for adopting regulations that are equally applicable to two different types of taxicab service. Id. The court entered judgment in favor of appellees on Counts V-VIII, concluding PPA's 2011 regulations applicable to appellees and other partial rights taxicabs were unreasonable in their entirety and therefore invalid, void, and unenforceable. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), order at ¶ 3.
PPA filed a timely motion for post-trial relief pursuant to Pa.R.C.P. 227.1, requesting judgment in its favor or, in the alternative, for clarification of the court's opinion and order.[16] On January 3, 2017, the court issued a memorandum and order disposing of PPA's post-trial motion. First, the court observed because PPA failed to cite to any specific finding of fact it believed to be erroneous and/or not supported by evidence, and made only generalized statements regarding evidence and testimony presented by appellees, PPA had presented "a purely legal challenge to the Court's Opinion and not one of [a] lack of substantial evidence." Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Jan. 3, 2017), slip op. at 2. The court thus rejected all of PPA's arguments except for its claim the court erred by invalidating all of the 2011 regulations. Although the court reiterated its conclusion the regulations failed to account for the differences between medallion taxicabs and partial rights taxicabs and therefore were a purely arbitrary exercise of PPA's rulemaking power, the court acknowledged appellees challenged only certain regulations and accordingly amended its order to declare invalid only the regulations specifically challenged by appellees.[17]
Appellants filed separate appeals to this Court. PPA essentially raises two issues: (1) whether the trial court erred by invalidating PPA's regulations; and (2) whether the trial court erred by concluding the Jurisdictional Agreement violated appellees' substantive due process rights. PUC joins in PPA's challenge regarding the Jurisdictional Agreement. We first turn to appellants' arguments regarding the Jurisdictional Agreement.
The Jurisdictional Agreement
PPA asserts the trial court erred in holding the Jurisdictional Agreement violates appellees' substantive due process rights. PPA notes jurisdiction over taxicabs is authorized by Act 94 and/or the Public Utility Code, the Commonwealth *229 Court's earlier decision in Bucks County II established PPA is authorized to regulate partial rights taxicabs, and the trial court thus properly concluded appellees may be required to comply with two separate sets of regulations. Bucks County Servs., Inc. v. PPA , 104 A.3d 604, 611 (Pa. Cmwlth. 2014). According to PPA, dual jurisdiction occurs for duly-inspected partial rights taxicabs only when a trip contains one point within the carrier's designated area of the City and one point outside of the City. 53 Pa.C.S. §§ 5714(c)(2), (c)(3), (d)(1)(i), (d)(1)(ii) ;[18] 52 Pa. Code § 1015.2(d) (partial-rights taxicab may accept street hail for taxicab service only at location within geographical boundaries identified in partial-rights taxicab certificate holder's PPA-approved tariff). PPA notes the parties at trial stipulated to the jurisdictional rights of each category of taxicabs. See n. 11, supra. PPA asserts when those stipulations are read in conjunction with Section 5714(c) and (d) it is clear which trips are regulated by PPA. PPA thus argues the Commonwealth Court erred by concluding the "Jurisdictional Agreement makes it impossible for [appellees] to determine when a taxicab is required to be in compliance with [PPA's] regulations." PPA Reply Brief at 7, quoting Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 47. PPA asserts the only significance of the Jurisdictional Agreement is that PUC agreed to defer its regulation of partial rights taxicabs in the limited circumstances enumerated in Section 5714(c)(2), (c)(3), (d)(1)(i), (d)(1)(ii), and the Jurisdictional Agreement did not grant or extend the jurisdiction of either agency.
PPA distinguishes the two types of taxicabs, noting a PUC-certified taxicab is authorized by a certificate of public convenience to provide service in a portion of the Commonwealth, except for the City, whereas a partial rights taxicab is authorized by a certificate of public convenience (1) subject to PUC's jurisdiction to provide service in a non-City portion of the Commonwealth and (2) subject to PPA's jurisdiction to provide taxicab service in a designated portion of the City. PPA asserts this distinction is important because appellees still have the ability to determine the *230 number of vehicles which will provide service in the City while maintaining their ability to provide service in their PUC-designated non-City areas; they simply have to register their City-service cabs with PPA, have them inspected by PPA and comply with PPA regulations, none of which violates appellees' rights. Finally, PPA contends appellees did not establish that any partial rights taxicab has been cited for a violation of the Jurisdictional Agreement (because the Jurisdictional Agreement is not a binding rule that can be violated by a taxicab), or that the Jurisdictional Agreement itself imposed any increased costs or an undue burden on them.
PUC explains that under Act 94 there are two instances where dual jurisdiction exists over trips performed by partial rights taxicabs: (1) from a point in its PPA authorized area to a point in its PUC authorized area, 53 Pa.C.S. § 5714(c)(2), 53 Pa.C.S. § 5714(d)(1)(ii), and (2) from a point in its PUC authorized area to a point in Philadelphia within its PPA authorized area, 53 Pa.C.S. § 5714(c)(3) ; 53 Pa.C.S. § 5714(d)(1)(i). PUC asserts the Jurisdictional Agreement properly clarifies which service will be regulated by PPA, does not add to PPA's jurisdiction, and even if the Jurisdictional Agreement did not exist, appellees would have to comply with PPA regulations for partial rights trips because Act 94 provides for dual regulation over such trips.
PUC further argues because Act 94 - not the Jurisdictional Agreement - is the source of PPA's oversight of dual jurisdiction trips, the Jurisdictional Agreement cannot violate appellees' due process rights. According to PUC, the Commonwealth Court erred in concluding the Jurisdictional Agreement was the source of confusion regarding the annual renewal and assessment procedures because the Jurisdictional Agreement does not establish the process; Act 94 and PPA regulations do this. Thus, PUC argues the court misconstrued the purpose of the Jurisdictional Agreement, which does no more than identify which dual jurisdiction trips fall under exclusive PPA jurisdiction. PUC argues the same reasoning applies to appellees' claim regarding enforcement/impoundment regulations and their alleged inability to maintain pre-Act 94 City service rights without registering their entire fleet with PPA and complying with PPA's regulations. PUC argues having to comply with different regulations for different jurisdictions is not a violation of appellees' due process rights, but rather a fact of doing business in two jurisdictions. PUC's Brief at 28, citing Bucks County II , 104 A.3d at 611 ("prospect of having to comply with competing, and perhaps even conflicting, regulatory regimes is an occupational hazard for any business enterprise that chooses to operate in more than one jurisdiction").[19]
Appellees respond they challenged the Jurisdictional Agreement only to the extent it affects the application and manner of enforcement of PPA's regulations of their service. Appellees argue the trial stipulations concerned only which trips provided by partial rights taxicabs are subject to PPA regulation and which trips are subject to PUC's regulation under the terms of the Jurisdictional Agreement. Appellees deny there was any stipulation regarding how the Jurisdictional Agreement affects the application and manner of the *231 enforcement of PPA's regulations; appellees claim the parties' continued dispute on this central issue is reflected in the contradictory testimony of PPA's own witnesses. Finally, appellees argue PPA has waived its claims of error pertaining to the Jurisdictional Agreement by making only generalized statements regarding testimony and evidence without referring to any specific finding of fact or conclusion of law.[20]
The appeal from the Commonwealth Court's determination regarding the validity of the Jurisdictional Agreement presents a pure question of law, and our standard of review is de novo and our scope of review is plenary. Powell v. Unemployment Comp. Bd. of Review , 638 Pa. 558, 157 A.3d 884, 890 (2017). In order to survive a substantive due process challenge "a statute or regulation must seek to achieve a valid state objective by means that are rationally related to that objective." Khan , 842 A.2d at 946 (citation omitted). Further, a substantive due process analysis requires courts to balance the rights of the individuals subject to the regulation against the public interest. Id. at 946-47 (citations omitted).
We begin by observing that in Section 5714(c) and (d) of Act 94 the General Assembly delineated the services permissible in the City by the two types of taxicabs. Dual jurisdiction over taxicabs whose designated territories include both areas within the City and suburbs exists in two instances: (1) when a taxicab provides service from within its designated City territory to an area outside the City within the taxicab's designated suburban territory, 53 Pa.C.S. § 5714(c)(2) and § 5714(d)(1)(ii), and (2) when a taxicab provides service from its designated suburban territory to an area within in its designated City territory, 53 Pa.C.S. § 5714(c)(3) and § 5714(d)(1)(i). In the most basic terms, dual jurisdiction exists over a trip because it either begins or ends in the carrier's designated City territory. Transport occurring completely within the City is within PPA's exclusive jurisdiction. Transport occurring completely outside the City is within PUC's exclusive jurisdiction. Through its regulations PPA has established that carriers who wish to: (1) respond to hails within their designated City territory, (2) perform point-to-point service in their designated City territory, and (3) transport a passenger from their designated City territory to a point in the City outside their designated territory must register with PPA the taxicabs the carriers intend to provide such service. Taxicabs which are registered and certificated by PPA must comply with PPA's regulations. Appellees' taxicabs that are not registered with PPA can only provide service consistent with their PUC certificates. 53 Pa.C.S. § 5714(d)(1).
The General Assembly recognized the existence of dual jurisdiction over the above-listed trips, and in Section 22(4) of Act 94 provided a method for PUC and PPA to determine whether both agencies would exercise jurisdiction over dual jurisdiction service or whether a single agency would exercise jurisdiction over dual jurisdiction service. 53 Pa.C.S. § 5701, Historical and Statutory Notes. Following the enactment of Act 94, appellants met to negotiate the dual jurisdiction issue and, in the resulting Jurisdictional Agreement, appellants agreed that where dual jurisdiction *232 exists over a trip, PUC would cede jurisdiction to PPA. See 35 Pa. B. 1737 (2005). Thus, under the Jurisdictional Agreement the trips listed in Sections 5714(c)(2), 5714(c)(3), 5714(d)(1)(i), and 5714(d)(1)(ii) are regulated by PPA.
Appellees alleged the Jurisdictional Agreement violates their substantive due process rights because (1) the Jurisdictional Agreement as administered through PPA's regulations relating to the filing of the PR-1 and the payment of the annual assessment is unconstitutionally vague; (2) PPA's enforcement of its regulations relating to the required inspection stickers through enforcement stops is unduly burdensome; and (3) appellees are unable to maintain their pre-Act 94 service rights without registering their entire fleets with PPA. The Commonwealth Court concurred, holding "[t]he Jurisdictional Agreement, as it relates to partial rights taxicabs, is unclear, vague, and inadequate and, therefore, unreasonable because it does not clearly define which entity, either the PUC or the [PPA] will regulate partial rights taxicab operations in the City." Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 46-47.
Our review reveals the Commonwealth Court erred in concluding the Jurisdictional Agreement violates appellees' substantive due process rights. The purpose of the Jurisdictional Agreement was to clarify whether PPA, PUC, or both agencies would regulate a trip which is subject to dual jurisdiction, and the Agreement simply states that where dual jurisdiction exists PUC cedes jurisdiction to PPA. Accordingly, the Commonwealth Court's holding regarding appellees' substantive due process rights could not properly have been based on the content of the Jurisdictional Agreement itself, but rather upon the requirements of Act 94 and PPA's regulations relating to the filing of the PR-1, the payment of the annual assessment, and PPA's enforcement system, which regulations PPA is duly authorized to promulgate. 53 Pa.C.S. § 5722 (PPA may prescribe such rules and regulations as it deems necessary to govern regulation of taxicabs in City). The Jurisdictional Agreement does not modify PPA's jurisdiction nor empower PPA to establish enforcement mechanisms. PPA's jurisdiction over partial-rights taxicabs and its enforcement powers emanate from Act 94. See 53 Pa.C.S. § 5705(b) (Commencement of complaints); 53 Pa.C.S. § 5707 (Budgets and Assessments); 53 Pa.C.S. § 5714(c), and (d). Thus, the Jurisdictional Agreement serves the legitimate state purpose of clarifying which state agency's jurisdiction takes precedence where dual jurisdiction exists. See Khan , 842 A.2d at 946 (to withstand substantive due process challenge regulation must seek to achieve valid state objective by means that are rationally related to that objective).
We recognize appellees' substantive due process claim is based upon their belief PPA's regulations are irrational as to appellees' operations. However, it is clear that if PPA had chosen to promulgate regulations identical to PUC's regulations promulgated pursuant to the Public Utility Code, which are less stringent and with which appellees already comply, appellees would have no objection to the Jurisdictional Agreement or PPA's regulations. PPA's regulations, particularly the requirements regarding registration of taxicabs with PPA, may well be confusing and burdensome, but the fact PPA promulgated poorly drafted regulations pursuant to Section 5722 of Act 94 does not invalidate the Jurisdictional Agreement. We reject the argument that the Jurisdictional Agreement itself unduly burdens appellees' right to provide service consistent *233 with their certificates of public service. The Commonwealth Court erred in holding otherwise.[21]
Accordingly, we reverse the Commonwealth Court's decision and vacate the judgment in favor of appellees on Count IV.
PPA's Regulations
PPA asserts the trial court applied the wrong standard when it used the Tire Jockey test to analyze appellees' substantive due process claims, and PPA further argues the court erred by concluding the 2011 regulations were arbitrary or unreasonable because they placed extra burdens on partial rights taxicabs. According to PPA, a regulation survives a substantive due process challenge when it aims to achieve a valid state objective by means that are rationally related to that objective and the rights of the individual are balanced against the public interest. PPA's Brief at 15-16, citing Khan , 842 A.2d at 947-48. PPA asserts appellees brought as-applied challenges, and as such, the court must consider the regulation's application to a particular person under particular circumstances that deprive that person of a constitutional right. Id., citing Commonwealth v. Veon , 637 Pa. 442, 150 A.3d 435, 458 (2016) (Donohue, J. dissenting). PPA argues the trial court improperly applied a general test of "reasonableness" to all partial rights taxicabs, rather than utilize the "as applied" analysis to the discrete circumstances presented by each appellee. PPA further asserts the regulations would survive an as-applied challenge because they have a rational relationship to the valid state goal of providing safe, legal, and dependable service consistent with PPA's grant of legislative power, and the regulations are neither unduly burdensome nor oppressive because every taxicab providing service in PPA's jurisdiction is required to comply with the same regulations.
PPA also argues the relief granted by the Commonwealth Court is inconsistent with Act 94 because appellees are not entitled to special treatment based on their status as operators of partial rights taxicabs. Act 94 is intended to provide uniform standards for all taxicabs providing service in the City. PPA notes where the General Assembly intended uniform treatment of both types of taxicabs within Act 94 it used the generic term "taxicabs"[22] and where it *234 intended to differentiate between the types of taxicabs it used the terms "medallion taxicabs" or "partial rights taxicabs." According to PPA, the challenged regulations are consistent with Act 94 because they do not always differentiate between types of taxicabs, but do differentiate in certain instances that warrant different treatment. PPA argues the Commonwealth Court erred by implicitly concluding partial rights taxicabs should not be considered the same as medallion taxicabs despite the language in Act 94 that treats them the same. PPA asserts the distinctions between the types of taxicabs -- Citywide service vs. partial service, medallions vs. certificate of public convenience, and annual partial rights vehicle assessment fees -- are not material to appellees' claims.
PPA further asserts appellees failed to present substantial evidence to establish violations of their substantive due process rights and the trial court erred in concluding otherwise. PPA argues appellees established only that the regulations apply uniformly to all types of taxicabs and failed to present evidence this is unreasonable or unduly burdensome as applied to partial rights taxicabs. PPA argues appellees failed to establish any of the challenged regulations deprived them of their rights to provide service in the City. Specifically, PPA argues appellees failed to show the regulations relating to vehicle age and mileage regulations ( 53 Pa.C.S. § 5714(a)(4), 52 Pa. Code § 1017.4(a) ), inspections ( 52 Pa. Code §§ 1017.2, 1017.32 ), meter seals ( 52 Pa. Code §§ 1017.21, 1017.25, 1017.26 ), partitions ( 53 Pa.C.S. § 5714(b), 52 Pa. Code § 1017.5(b)(12) ), driver certification ( 53 Pa.C.S. § 5706(a), 53 Pa. Code §§ 1021.2, 1021.4(3), 1021.7, 1021.8, 1021.9), annual information filing ( 53 Pa.C.S. § 5707(c)(1)(ii), 52 Pa. Code § 1011.3 ), and out-of-service designations ( 52 Pa. Code §§ 1003.31, 1003.32 ), were unreasonable or created an undue burden as applied to them, or deprived them of their right to provide service in the City. PPA's Brief at 21-35.
Finally, PPA argues the trial court erred by granting relief to certain appellees who did not present any evidence at trial.[23] According to PPA, all parties who joined together pursuant to Pa.R.C.P. 2229(a) to assert as-applied challenges were required to present evidence regarding the application of the regulations to themselves. Pa.R.C.P. 2231(c) ("The trial of an action in which parties have joined or have been joined under Rules 2228 and 2229 shall be conducted as if independent actions between such parties had been consolidated for trial."). PPA notes only Bucks County Services, Inc. and Germantown Cab Co. presented evidence at trial, and at the close of PPA's case-in-chief it moved for non-suit on the basis of the insufficiency of the evidence generally and the failure of five other plaintiffs to present any evidence at all.
According to appellees, the trial court did not declare PPA's regulations unconstitutional "as applied" to appellees' operations, but rather correctly determined the regulations were unreasonable and invalid under the Tire Jockey test. Appellees'
*235 Brief at 18-19, citing Tire Jockey , 915 A.2d at 1186 (agency regulation is valid and binding so long as it is "(a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable"). Appellees further argue that, by making only generalized statements regarding testimony and evidence presented at trial without relating it to any specific improper finding of fact, PPA has waived its right to challenge the trial court's decision relating to the challenged regulations. Id. at 20-21.
Appellees also contend the Commonwealth Court's decision is not inconsistent with Act 94 and PPA's argument otherwise fails because PPA makes only generalized statements, fails to cite any specific erroneous finding of fact or conclusion of law, and does not specify how the trial court's findings and conclusions conflict with Act 94. According to appellees, PPA relies exclusively on a purely legal argument Act 94 mandates uniform regulation of all taxicabs, except where a provision explicitly applies only to medallion taxicabs; appellees claim PPA has thus waived any challenge to the trial court's findings of material differences between medallion and partial rights taxicabs or the disproportionate regulatory and financial burden the regulations impose on appellees. Appellees argue, pursuant to Tire Jockey , the trial court correctly concluded the evidence supported its conclusion PPA unreasonably ignored the material differences between the two types of taxicabs and possible disproportionate regulatory and financial burdens that could result from uniform application of the regulations. Appellees contend PPA did not present any witnesses or other evidence to explain its rationale for adopting uniform regulations within the City.
Appellees further argue PPA has waived any argument the Commonwealth Court's conclusions were not supported by substantial evidence. In support of this contention, appellees rely upon the trial court's opinion stating PPA made only generalized statements regarding testimony and evidence presented by appellees at trial, and interpreting PPA's post-trial motion as presenting a purely legal challenge rather than a claim the record lacked substantial evidence of its claims. Appellees' Brief at 15, citing Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Jan. 3, 2017), slip op. at 2.
Finally, appellees argue PPA waived its claim the Commonwealth Court erred in granting relief to the partial rights taxicab carriers who did not appear at trial because PPA did not preserve the claim in post-trial motions as required by Pa.R.C.P. 227.1(b)(1). In any event, appellees observe a party appears for trial if counsel is present on behalf of the named party, which occurred here.[24] Appellees' Brief at 16, citing Shappell v. Kubert , 763 A.2d 892, 894 (Pa. Super. 2000) ("We note that it is possible for counsel to appear on behalf of a party for trial, select a jury and proceed to trial without the named party's presence."). Appellees also contend that, in order to preserve this claim, PPA should have moved for non-suit pursuant Pennsylvania Rule of Civil Procedure 218 at the commencement of the trial, and by failing to do so waived this issue for purposes of both post-trial motions and appellate review.
We first consider whether the Commonwealth Court erred by analyzing *236 appellees' challenges to the 2011 regulations under the three pronged Tire Jockey test. A review of the record demonstrates appellees challenged the validity of the regulations on the basis they were unreasonable, that is, pursuant to the Tire Jockey test, and also on the basis the regulations violated their substantive due process rights. See Amended Petition for Review at ¶ 82, 89, 91, 92, 101, 108, and 110 (asserting the regulations were not within PPA's statutory authority). In addition, in their pre-trial statement, appellees proffered their trial evidence would prove, pursuant to Tire Jockey, that PPA's regulations are invalid because: (1) there is no rational basis for regulating taxicab service based on the destination of trips provided; (2) there is no rational basis for requiring appellees to comply with redundant regulatory requirements; and (3) compliance with conflicting standards is impossible. See Pretrial Statement, dated 9/15/2015, at 3-5. Pursuant to Pennsylvania Rule of Civil Procedure 1020(c), "causes of action...may be pleaded in the alternative." Schreiber v. Republic Intermodal Corp. , 473 Pa. 614, 375 A.2d 1285, 1291 (1977) ("[P]laintiffs should not be forced to elect a particular theory in pursuing a claim" to avoid "the attendant possibility that meritorious claims will fail because the wrong legal theory was chosen."). Thus, it was within the trial court's purview to assess the evidence and determine the validity of the regulations under either the Tire Jockey test or a substantive due process analysis.[25]
We also reject PPA's argument the relief granted by the Commonwealth Court is inconsistent with Act 94 because the act is intended to provide for uniform taxicab service throughout the City. In Section 5701.1(1) of Act 94, 53 Pa.C.S. § 5701.1(1) (Legislative Findings), the General Assembly set forth its reasons for transferring authority to regulate taxicab and limousine service in the City to PPA. Section 5701.1(1) provides:
The General Assembly finds and declares as follows:
(1) The health, safety and general welfare of the people of this Commonwealth are directly dependent upon the continual encouragement, development, growth and expansion of business, industry, commerce and tourism.
(2) Unemployment, the spread of poverty and the heavy burden of public assistance and unemployment compensation can be avoided by the promotion, attraction, stimulation, development and expansion of business, industry, commerce and tourism in this Commonwealth through the development of a clean, safe, reliable and well-regulated taxicab and limousine industry locally regulated by parking authorities in cities of the first class.
(3) Due to the size, total population, population density and volume of both tourism and commerce of a city of the first class, it may be more efficient to regulate the taxicab and limousine industries through an agency of the Commonwealth with local focus than an agency with diverse Statewide regulatory duties. Well-regulated local focus on improving those industries can be an important factor in the continual encouragement, development, attraction, stimulation, growth and expansion of business, industry, commerce and tourism within a city of the first class, the surrounding counties and this Commonwealth as a whole.
*237 53 Pa.C.S. § 5701.1. Section 5701.1 is simply a policy declaration that reflects the General Assembly's aspiration that local regulation of taxicabs by PPA will improve the taxicab industry in the City and possibly help the economy. Although the General Assembly specifically distinguishes medallion taxicabs and appellees in certain provisions of Act 94, such distinctions do not equate to a legislative requirement that PPA must regulate medallion taxicabs and appellees (as operators of partial rights taxicabs) uniformly in all other instances. Thus, contrary to PPA's assertion, Act 94 does not mandate uniform regulation of all taxicab service in the City. PPA's argument on this issue is further undermined by the fact that appellees' taxicabs, which are not registered with PPA, may still legally perform services in the City pursuant to their PUC certificated authority without complying with PPA regulations. Appellees' City designated territories, which are located in Northwest Philadelphia, Northeast Philadelphia and Southwest Philadelphia, are underserved or unserved by medallion taxicabs. Appellees provide taxicab service to local residents in areas of the City that medallion taxicab operators do not find lucrative or avoid due to safety concerns. Bucks County Servs. Inc. v. PPA , No. 584 M.D. 2011, (Pa. Cmwlth. Nov. 28, 2016), slip op. at 23, FOF No. 57, citing Notes of Testimony at 311-12. The General Assembly's policy determination that local regulation of taxicab service within the City is desirable does not exempt PPA from the obligation to determine whether its regulations will improve the taxicab industry within the City -- a calculation that should take into consideration the differing service types, clienteles, and business models among City taxicabs. Accordingly, we hold the relief granted by the Commonwealth Court is not inconsistent with Act 94.
Turning to the Commonwealth Court's analysis under the Tire Jockey test, we conclude the court did not err in determining the regulations were unreasonable. As stated, when adjudicating the validity of a regulation adopted pursuant to an agency's rulemaking power a court must consider whether regulations are: (1) within the agency's granted power; (2) issued pursuant to proper procedure; and (3) reasonable. Tire Jockey, 915 A.2d at 1186 ; Popowsky v. PUC , 589 Pa. 605, 910 A.2d 38, 53 (2006) ; Rohrbaugh , 727 A.2d at 1085. Moreover, properly promulgated regulations are generally presumed to be reasonable. Burstein v. Prudential Prop. & Cas. Ins. Co. , 570 Pa. 177, 809 A.2d 204, 208 (2002). In determining the reasonableness of any discretionary agency action, "appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." Rohrbaugh , 727 A.2d at 1085.
The first prong of the Tire Jockey test is satisfied because PPA is authorized by Section 5722 of Act 94 to promulgate regulations relating to taxicab service in the City. Further, with respect to prong two, there is no question that PPA promulgated the 2011 regulations using the proper procedures. However, the Commonwealth Court concluded PPA's regulations were unreasonable and arbitrary because the PPA ignored the material differences between appellees and medallion taxicab operators relating to the services provided, the clientele, geographic footprints, and business models (fleet vs. medallion) when promulgating the regulations. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 37. The court further concluded there was ample evidence showing a disproportionate burden *238 on appellees, and PPA failed to present any evidence demonstrating "its rationale for adopting regulations that were equally (and blindly) binding on both medallion cabs and [appellees]." Id.
The Commonwealth Court did not err in this regard. As noted, the court identified material differences between the regulations' application to appellees and medallion taxicab operators, which results in an unreasonable and arbitrary burden upon appellees. First, appellees operate fleets of cabs; appellee Bucks County Services operates approximately eighteen cabs while appellee Germantown Cab Co. operates nearly 150 cabs. Appellees must purchase, outfit, maintain, and insure each vehicle they operate. Medallion-holders operate a single vehicle per medallion and that medallion may be used as collateral to fund operating expenses. The number of medallions issued is limited to 1765, see 53 Pa.C.S. § 5711(c), and as a result, between 2013 and 2014 medallions appreciated in value from $450,000 to $500,000. See PPA's Answer to Amended Petition for Review, at ¶ 14; PPA's Brief in Opposition to Summary Relief, at 38.[26] The types of services provided by appellees and medallion taxicab operators are also materially different. While operating in their suburban territories appellees travel longer distances and accumulate mileage at a faster rate than medallion taxicab operators, who primarily provide shorter rides within Center City and its adjoining neighborhoods. In their city territories, appellees primarily provide dispatch services to local residents for trips to the grocery store or doctors' appointments in residential neighborhoods, which are typically underserved, while medallion taxicabs primarily provide services to business persons, tourists, and residents in the City's business, sports, entertainment, university, and historic districts in addition to 30th Street Station, Suburban Station, and Philadelphia International Airport. Although the territories of appellees and medallion cabs overlap, the record shows the material differences between appellees and medallion taxicabs were not eradicated simply by the repeal of the Medallion Act and the promulgation of Act 94. It is these material differences which drive our conclusion that the 2011 regulations, which place an unreasonable and arbitrary burden on appellees without a proper rationale supporting uniform application of the regulations, constitute an arbitrary exercise of PPA's rule-making authority. Tire Jockey , 915 A.2d at 1186 (regulation which is "a purely arbitrary execution of the agency's duties or functions" is unreasonable).
We observe that, when promulgating regulations, the PPA may not rely solely upon the fact a taxicab provides service in the City to justify the imposition of uniform regulations. Pursuant to its statutory authority, PPA is required to take into account the "health, safety and general welfare of the people" and the perceived *239 need for improvement in the taxicab industry. 53 Pa.C.S. § 5701.1. The Commonwealth Court made detailed findings indicating appellees presented sufficient evidence at trial to support their claims the material differences between medallion taxicabs and appellees rendered the challenged regulations an arbitrary exercise of PPA's authority. See Bucks County Servs. Inc. v. PPA , No. 584 M.D. 2011, (Pa. Cmwlth. Nov. 28, 2016), slip op. at 16-23, FOF Nos. 43-59. For example, PPA's regulation relating to safety shields inhibited appellees' ability to compete with non-partial rights suburban carriers for both passengers and drivers and was ineffective for its intended purpose. In addition, Section 1011.3 of the 2011 regulations requires the registration of taxicabs with PPA and triggers a concomitant obligation to comply with PPA's regulations regarding payment of annual assessments, inspections, TLD stickers, driver certification and training, vehicle specifications, and meters. It also subjects appellees' taxicabs to PPA out-of-service orders for failure to comply with the 2011 regulations and places substantial financial burdens upon appellees. According to the Commonwealth Court's findings, these financial burdens endanger appellees' ability to provide services in their designated City territories and, when considered in the context of the General Assembly's policy declaration in Section 5701.1, undermines the public interest in having more (not less) taxi service in those areas. PPA's regulations should neither hinder nor endanger appellees' ability to provide such service.
Finally, we reject PPA's claim the Commonwealth Court erred in granting relief to the appellees who did not participate at trial. A regulation adopted pursuant to an agency's legislative rule-making authority is the "the product of an exercise of legislative power by an administrative agency." Rohrbaugh , 727 A.2d at 1085. The Tire Jockey test determines whether the agency has properly exercised its legislative rule-making power. The Commonwealth Court correctly applied that test to hold the challenged regulations are unreasonable, the PPA failed to properly exercise it authority, and the regulations are thus invalid as to all partial rights taxicabs irrespective of whether or not a particular operator presented evidence at trial. We therefore affirm the judgment in favor of appellees with respect to the regulations challenged in Counts V-VIII of the Amended Petition for Review.
Accordingly, the order of the Commonwealth Court is reversed in part and affirmed in part. Jurisdiction relinquished.
Justices Baer, Todd, Donohue, Wecht and Mundy join the opinion.
Justice Wecht files a concurring opinion.
Chief Justice Saylor files a concurring and dissenting opinion.
I join the learned Majority's Opinion in full. I write separately to comment upon the evolution of the Tire Jockey[1] standard, and upon the manner in which litigants may challenge administrative actions.
Appellees are operators of partial-rights taxicabs in Philadelphia. With the enactment of Act 94 in 2004,[2] Appellees became subject to a regulatory overlap by the Public Utility Commission ("PUC") and the Philadelphia Parking Authority ("PPA"). PUC and PPA resolved this overlap *240 by entering into a Jurisdictional Agreement in February 2005, subjecting Appellees to PPA's regulations. In 2011, PPA promulgated regulations pursuant to the Regulatory Review Act, 71 P.S. §§ 745.1 - 745.14, and the Commonwealth Documents Law, 45 P.S. §§ 1201 -08, which, pursuant to the Jurisdictional Agreement, it sought to apply to Appellees.
In November 2011, Appellees filed a petition for review in the Commonwealth Court's original jurisdiction challenging the Jurisdictional Agreement and the application of the new regulations to partial-rights taxicabs. Appellees argued that the Jurisdictional Agreement was invalid because it violated Act 94, Appellees' rights to due process, and Appellees' rights to equal protection generally and under the Uniformity Clause of the Pennsylvania Constitution. Appellees also raised two challenges to the regulations. Appellees argued that the regulations exceeded PPA's statutory authority, and that they violated Appellees' substantive due process rights.
The Commonwealth Court invalidated the Jurisdictional Agreement on substantive due process grounds. As to Appellees' challenges to the regulations, the Commonwealth Court examined whether the regulations exceeded the authority provided to PPA in Act 94. The court held that the challenged regulations, as they applied to Appellees, were arbitrary and unreasonable and, therefore, exceeded PPA's statutory authority.
I join the Majority's reversal of the Commonwealth Court's invalidation of the Jurisdictional Agreement. To withstand this substantive due process challenge, the government action must seek to achieve a valid state objective by means that are rationally related to that objective. Khan v. State Bd. of Auctioneer Exam'rs , 577 Pa. 166, 842 A.2d 936, 946 (2004). Here, as the Majority Opinion explains, the Jurisdictional Agreement meets the rational basis standard and, therefore, is constitutional. See Maj. Op. at 232-33.
As to Appellees' challenge to the PPA's regulations, the Majority correctly recognizes that the Commonwealth Court resolved this challenge not upon substantive due process grounds, as PPA now maintains, but upon an analysis of whether the regulations exceeded the grant of statutory authority. In doing so, the Commonwealth Court relied upon Tire Jockey .
In Tire Jockey , this Court established two layers of analysis to resolve a challenge to an agency's interpretation of its governing regulation. The first layer of analysis examines "(1) whether the interpretation of the regulation is erroneous or inconsistent with the regulation, and (2) whether the regulation is consistent with the statute under which it was promulgated." Tire Jockey , 915 A.2d at 1186. The second layer of analysis provides that, "when an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretative rule-making power, it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." Id.
Tire Jockey was this Court's attempt to build upon a past effort to harmonize this two-step analysis into "a uniform and joint application." Tire Jockey , 915 A.2d at 1186, n.20 (citing Popowsky v. Pa. Pub. Util. Comm'n , 589 Pa. 605, 910 A.2d 38, 53 (2006) ). At issue in Popowsky was the PUC's interpretation of its regulation. Considering this interpretation, the Court first questioned whether PUC's interpretation of its regulation was consistent with the plain language of the regulations, and found that it was. Next, the Court assessed whether the regulation was consistent with the statute under which it was promulgated.
*241 Popowsky , 910 A.2d at 53. To resolve this question, the Court invoked the three-part test used to determine whether a regulation is valid and binding upon the courts. Id. at 54 (because the rule-making power at issue was legislative in nature, "to be binding, the regulations must fall within the power delegated to the PUC, be enacted according to proper procedures, and be reasonable").
In other words, the Popowsky Court conflated the two layers of analysis. Analyzing the regulation in this manner made sense in Popowsky , where the agency's interpretation of the regulation did not differ from the language of the regulation itself. Beyond such circumstances, however, it may be necessary to differentiate between the two layers of analysis.
As articulated in Tire Jockey , the first layer of the two-layered analysis examines the validity of the agency's interpretation of its own regulation. The second layer examines the validity of the agency's legislative rule-making. Legislative rule-making is an exercise of legislative power by an administrative agency, pursuant to a grant of that power by the General Assembly. Id. at 53.
Although it would appear that the second part of the first layer ("whether the regulation is consistent with the statute under which it was promulgated") is duplicative of the first part of the second layer (whether the regulation was "adopted within the agency's granted power"), I would suggest that the two inquiries are distinct. The first layer of analysis resolves a challenge to the agency's interpretation of its own regulation. Therefore, asking "whether the regulation is consistent with the statute under which it was promulgated" is, more precisely, an examination of whether the regulation as interpreted is consistent with the statute under which it was promulgated.
In Commonwealth , Department of Public Welfare v. Forbes Health System , this Court focused upon the agency's interpretation of its own regulation in applying the first layer of analysis. 492 Pa. 77, 422 A.2d 480, 482 (1980) (examining "whether the regulations as interpreted by [the agency] are consistent with the statutes they implement") (emphasis added). The Court held that, because there was no conflict between the enabling statutes and the agency's interpretation of its regulation, the agency's interpretation was valid. Id. at 484. Forbes Health System makes it abundantly clear that the second part of the first layer of analysis focuses upon the regulations as interpreted by the agency. See e.g., Pelton v. Commonwealth, Dep't of Pub. Welfare , 514 Pa. 323, 523 A.2d 1104, 1109 (1987) (resolving a challenge to an agency's interpretation of its regulation by concluding that the agency's interpretation was consistent with its regulation and that "the agency's decisions are made within the parameters of the law").
Focusing upon the agency's interpretation of its regulations in applying the second part of the first layer distinguishes this analysis from that contemplated by the first part of the second layer of the Tire Jockey analysis. In contrast to the first layer of analysis, the first part of the second layer of the Tire Jockey analysis requires regulations promulgated pursuant to the agency's rule-making power to "fall within the power delegated" to the agency. Popowsky , 910 A.2d at 54. This inquiry is focused upon whether the agency's regulations are authorized by the statute, Id. , and is resolved by examining the language of the statute that granted authority to the agency, Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Review , 603 Pa. 374, 983 A.2d 1231, 1239 (2009).
Having established that the second part of the first layer of analysis is distinct *242 from the first part of the second layer, I question the wisdom of this Court's attempt in Tire Jockey to harmonize the two distinct inquiries. One inquiry addresses a challenge to an agency's interpretation of its own regulation, and one inquiry challenges the regulations themselves. Rather than subjecting an agency action to Tire Jockey's two layers of analysis, the nature of the challenge may render the first or second layer of the Tire Jockey analysis unnecessary. For example, absent a challenge to an agency's regulation, there would be no need to engage in the second layer of this analysis at all. See Pelton , 523 A.2d at 1109 (applying solely the first layer of analysis to determine that the agency's interpretation of its own regulation was consistent with the regulation and the statute); Forbes Health Sys. , 422 A.2d at 482 (solely applying the first layer of analysis to uphold the agency's interpretation of its own regulations). The first layer of the Tire Jockey test is implicated when the challenged action is an agency interpretation of a regulation. When the challenged action is solely to the regulation itself, such as the challenge to PPA's regulations in this case, only the second layer of the Tire Jockey test is implicated.
The second part of the second layer of analysis examines whether the agency issued its regulation pursuant to proper procedure. Tire Jockey , 915 A.2d at 1186. The proper procedure for enacting regulations may vary depending upon the legislative authority under which the regulations are promulgated. See, e.g., Slippery Rock , 983 A.2d at 1242 (noting the Department of Labor and Industry's argument that, in promulgating the Regulation, the Department followed the procedures of the Commonwealth Documents Law, the Commonwealth Attorneys Act, 71 P.S. §§ 732-101 - 732-506, and the Regulatory Review Act, as required when adopting a legislative regulation); Germantown Cab Co. v. Phila. Parking Auth. , 993 A.2d 933, 937 (Pa. Cmwlth. 2010) ("[W]hen promulgating a regulation, an agency must comply with the requirements set forth in the Commonwealth Documents Law, the Commonwealth Attorneys Act and the Regulatory Review Act.").
The final part of the second layer of analysis examines whether the agency's regulation is reasonable:
In deciding whether an agency action, such as promulgation of a legislative regulation, is reasonable, we are 'not at liberty to substitute [our] own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action involved, it is not enough that [the agency's regulation] shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment.'
Slippery Rock , 983 A.2d at 1242 (quoting Pa. Human Res. Comm'n v. Uniontown Area Sch. Dist., 455 Pa. 52, 313 A.2d 156, 169 (1973) ).
Moreover, "[r]egarding the reasonableness prong, 'appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.' " Tire Jockey , 915 A.2d at 1186 (quoting Rohrbaugh v. Pa. Pub. Util. Comm'n , 556 Pa. 199, 727 A.2d 1080, 1085 (1999) ).
With this framework in mind, an individual or entity that finds itself the target of an administrative agency action or otherwise *243 subject to the agency's authority, and who wishes to challenge that authority, may do so in a number of ways. Assuming the litigant has exhausted all required administrative remedies, the litigant may seek redress in the courts by challenging the agency's enabling statute, challenging the agency's regulation, or challenging the agency's interpretation of its regulation.
A challenge to the agency's enabling statute may be a constitutional challenge. For example, a litigant could challenge whether a statute violates the litigant's substantive due process rights. "To constitute a lawful exercise of the state's police power, social and economic legislation must first be directed toward a valid state objective." Khan , 842 A.2d at 946. To withstand a substantive due process challenge to which heightened scrutiny does not apply, "a statute or regulation must seek to achieve a valid state objective by means that are rationally related to that objective." Id. In the context of a substantive due process challenge subject to rational basis review, it is not enough for the litigant to establish that the legislation is unreasonable. Rather, under the rational basis test, "a statutory classification will be upheld so long as it bears a reasonable relationship to accomplishing a legitimate state purpose." Commonwealth v. Duda , 592 Pa. 164, 923 A.2d 1138, 1151 (2007).
As another example, the litigant could challenge the statute as an unconstitutional delegation of legislative power. See, e.g., Protz v. W.C.A.B. (Derry Area Sch. Dist.), 639 Pa. 645, 161 A.3d 827, 831 (2017) (providing that, when the General Assembly assigns the authority and discretion to execute or administer a law, the state constitution imposes two fundamental limitations: "first, the basic policy choices must be made by the [l]egislature; and second, the legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions") (internal citations omitted).
A challenge to the agency's regulation may also rest upon constitutional grounds. Thus, a regulation may be challenged, for example, as violating substantive due process, equal protection, or procedural due process. In addition, pursuant to Tire Jockey , an agency's regulation may be challenged as exceeding the agency's granted power, as not being issued pursuant to proper procedures, or as unreasonable. Tire Jockey , 915 A.2d at 1186. In this context, the reasonableness of the regulation is assessed pursuant to the deferential standard stated above, which examines whether the agency's regulation was made in bad faith, constitutes a manifest or flagrant abuse of discretion, or is a purely arbitrary execution of the agency's duties or functions. Id.
A challenge to an agency's interpretation of its own regulation may also be premised upon the Constitution, as an agency's interpretation of an otherwise constitutional regulation could itself be unconstitutional. See Forbes Health Sys., 422 A.2d at 486 (discussing a procedural due process claim arising from an interpretation of a regulation). In addition, an agency's interpretation of its own regulation may be challenged as invalid in accord with the first level of analysis in Tire Jockey . This would require a litigant to establish that the agency's interpretation is erroneous or inconsistent with the regulation or with the statute under which it was promulgated.
Consistent with my understanding of Tire Jockey , the challenge in this case to PPA's regulations does not rest upon the agency's interpretation of its regulations, but upon its application of the regulations to Appellees. The Majority Opinion therefore astutely applies only the second layer of analysis provided in Tire Jockey . Because *244 there is no question at this juncture as to whether the regulations were adopted within the agency's granted power or issued pursuant to proper procedure, Appellees' challenge depends upon the third part of the second layer of analysis provided by Tire Jockey : whether the regulations are reasonable.
Before the Commonwealth Court, Appellees argued that PPA failed to consider the financial impact on partial-rights taxicabs of abolishing all regulatory distinctions between medallion and non-medallion taxicabs. Appellees asserted that they are required to sustain the regulatory burden of operating a medallion taxicab without receiving any of its benefits.
The Commonwealth Court agreed, finding the regulations "bereft of reasonableness with respect to partial-rights taxicabs." Bucks Cty. Servs., Inc. v. Phila. Parking Authority, 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 36. According to the Commonwealth Court, by treating all taxicabs the same, the regulations failed to account for material differences between medallion and partial-rights taxicabs. The uniform regulations therefore imposed a disproportionate regulatory burden upon partial-rights taxicabs, which do not have the authority to operate on a citywide basis as medallion taxicabs do. Despite the material differences between medallion and partial-rights taxicabs, the Commonwealth Court observed that PPA presented no witnesses or other evidence to explain its rationale for adopting uniform regulations. Because PPA failed to account for the material differences, the Commonwealth Court held that its imposition of disproportionate burdens upon partial-rights taxicabs rendered its 2011 regulations a purely arbitrary exercise of its rulemaking power.
Before this Court, PPA insists that the Commonwealth Court decided Appellees' challenge to the regulations on substantive due process grounds, and asserts that the regulations pass rational basis review. As the Majority Opinion establishes, this is simply not correct. See Maj. Op. at 227, n.14 (explaining that the Commonwealth Court resolved Appellees' challenge to the regulations not upon substantive due process grounds, but because the regulations exceeded PPA's statutory authority).
Considering Appellees' challenge, as resolved by the Commonwealth Court, the pertinent analysis is the reasonableness of the regulations under the Tire Jockey standard, not the rational basis review that would pertain to a substantive due process challenge. The Commonwealth Court found that applying the regulations to partial-rights taxicabs was arbitrary, which rendered the regulations unreasonable as to Appellees and, therefore, invalid. Because PPA offers nothing to refute the Commonwealth Court's analysis, I am not persuaded that the Commonwealth Court was incorrect in concluding that the regulations "are bereft of reasonableness" as to partial-rights taxicabs. Therefore, I join the Majority's affirmance of the Commonwealth Court.
I join the majority's analysis and holding as concerns the validity of the Jurisdictional Agreement between the Public Utility Commission and the Philadelphia Parking Authority ("PPA").
In terms of the individual PPA regulations, the majority applies a line of authority, exemplified by Tire Jockey Service, Inc. v. DEP , 591 Pa. 73, 915 A.2d 1165 (2007), concerning the validity of legislative rules. According to the majority, in light of its application of the Tire Jockey strain of analysis, there is no need to consider Appellees'
*245 substantive due process claims. See Majority Opinion, op. at 236 n.25.
I believe that it is important to understand, however, that assertions that particular legislatively-sanctioned regulations are substantively unfair or unreasonable are tantamount to substantive due process challenges, whether these are couched under the Tire Jockey rubric or otherwise. Accord Am. Radio Relay League, Inc. v. FCC , 617 F.2d 875, 879 (D.C. Cir. 1980) ("Whether we say a [legislative] rule must be 'reasonable,' must have a 'rational basis,' or must not be 'arbitrary or capricious,' our standard for reviewing the rule is the same: we must defer to the agency rulemakers unless the challenger shows that the agency has abused the broad policymaking discretion granted it by Congress and thereby acted beyond the scope of its rulemaking authority.").[1] In this regard, I also note that the "reasonableness" criterion of the Tire Jockey test is somewhat of a misnomer, since the case law defines the term, in the relevant context, as connoting the higher bar of rationality. See, e.g. , Rohrbaugh v. PUC , 556 Pa. 199, 208, 727 A.2d 1080, 1085 (1999) ("[A]ppellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.").
As the majority otherwise relates, error, lack of wisdom, and burdensomeness are insufficient to support judicial intervention to overturn duly-promulgated legislative rules. See id. Properly understood, therefore, a challenge under the "reasonableness" facet of the Tire Jockey test implicates all of the concerns presented by the Lochner era of substantial judicial interference with social and economic regulation under the rubric of due process. See generally Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963) (describing a return to "the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies" after the Lochner era).[2]
Upon review of the record, it is my considered judgment that Appellees failed to overcome the presumption of reasonableness and the "particularly high measure of deference" associated with validly promulgated legislative rules. Nw. Youth Servs., Inc. v. DPW , 620 Pa. 140, 157, 66 A.3d 301, 311 (2013) (citing, inter alia , *246 Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc. , 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) ). Mostly, Appellee's challenge consisted of local taxicab business owners and managers testifying, anecdotally, that the regulations were burdensome to their companies. For example, while there was evidence of countervailing cost and inconvenience concerns, there was no empirical proof that the requirement of partitions in taxicabs does not improve safety and, is therefore, not rational.[3] By way of another example, concerning the age and mileage limitations embodied in the regulations, Appellants aptly observe both that the age factor is prescribed by statute in the first instance, see 53 Pa.C.S. § 5714(a)(4), and it is a matter of common experience that 250,000 miles on an automobile can raise reliability concerns. Accord Keystone Cab Serv., Inc. v. PUC, 54 A.3d 126, 129 (Pa. Cmwlth. 2012).
In terms of economic impact, Appellants did not open their books to the court and demonstrate an economic oppressiveness of the regulations. Rather, the proofs were, again, of a more anecdotal nature. See, e.g. , N.T., Dec. 13, 2011, at 102-03 (reflecting the testimony of a family business owner that she has had to borrow money against her house in an attempt to comply with the PPA regulations).[4] Consistent with an allusion by the majority, see Majority Opinion, op. at 236 n.26, the discussion about medallion owners being able to collateralize that asset is not particularly informative, especially in light of the testimony suggesting that some medallion owners may have lost hundreds of thousands of dollars on their investments. See N.T., Oct. 15, 2015, at 375 (reflecting testimony from a witness for Appellees to the effect that medallions may previously have been worth as much as $525,000, but presently, a seller would be unlikely to receive more than $100,000).
To me, the majority's determination that the presumption of reasonableness has been overcome based on the evidence presented -- and its concomitant allocation of the burden to Appellees to supply a further rationale supporting uniform application of the regulations to all taxicabs performing point-to-point services in Philadelphia -- resembles an application of the "hard look doctrine" applied, under the federal Administrative Procedures Act, to some instances of informal agency rulemaking. See, e.g., Patrick M. Garry, Judicial Review and the "Hard Look" Doctrine , 7 NEV. L.J. 151, 152 (2006) (noting that the Supreme Court of the United States "has solidified the 'hard look' doctrine, which required courts to take a more scrutinizing look at informal rulemaking *247 than had been taken under earlier applications of the arbitrary and capricious test"); Aaron L. Nielson, In Defense of Formal Rulemaking , 75 OHIO ST. L.J. 237, 255 (2014) ("In fact, under hard-look review, a regulated party can, in a way, sometimes obtain a diluted form of formal rulemaking by attacking an informal rule's 'impact studies, cost-benefit analyses, and risk assessments.' "). The present examples of rulemaking, however, are formal ones per Pennsylvania law at least, and this Court has not previously retreated from applying the presumption of reasonableness and a strong measure of deference to such legislative rules.[5]
In summary, I find the quantum and quality of evidence adduced here to be inadequate to overcome the presumption of validity accorded to duly-promulgated legislative rules. As I read the record, at most Appellees made a case that the PPA regulations are burdensome but not irrational. For these reasons, I respectfully disagree with the affirmance of the Commonwealth Court's decision on the latter issue.

Act of July 16, 2004, P.L. 758, No. 94, effective March 12, 2005, as amended . In July of 2012, the General Assembly amended Act 94 by enacting Act 119. Act of July 5, 2012, P.L. 1022, No. 119.

Section 22(4) of Act 94, which is not included in the codified version of the law, see Bucks County Servs. Inc. v. PPA , No. 584 M.D. 2011, (Pa. Cmwlth. Nov. 28, 2016), slip op. at 4 n.5, provides:
(4) The [PUC] shall assist the [PPA] to prepare for the transfer and to ensure a smooth transition with as little disruption as possible to public safety, consumer convenience and the impacted industries. The [PUC] and the [PPA] are empowered to resolve by mutual agreement any jurisdictional issues that may be associated with the transfer. Any agreement shall be reported to the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives and will be considered effective unless either the Senate or the House of Representatives rejects the submitted agreement by resolution within ten legislative days of submission. Upon becoming effective, an agreement shall be published in the Pennsylvania Bulletin.
53 Pa.C.S. § 5701, Historical and Statutory Notes.

PPA's 2005 regulations were invalidated by the Commonwealth Court for failure to comply with the Commonwealth Documents Law. Germantown Cab Co. v. PPA , 993 A.2d 933 (Pa. Cmwlth. 2010), aff'd per curiam , 614 Pa. 133, 36 A.3d 105 (2012).

In January 2012, appellees filed an Amended Petition for Review. In June 2013, a three-judge panel of the Commonwealth Court sustained appellants' preliminary objections and struck Count IV, which sought a declaration the Jurisdictional Agreement was invalid, for failure to join indispensable parties. Bucks County Servs., Inc. v. PPA , 71 A.3d 379 (Pa. Cmwlth. 2013) (Bucks County I ). In June 2014, appellees and PPA filed cross-motions for summary relief as to Count III, which asserted PPA lacked the authority to regulate partial rights carriers' operations within the City under Act 94. A three-judge panel of the Commonwealth Court granted summary relief in appellants' favor concluding by operation of law Act 94 authorizes PPA to regulate partial rights carriers. Bucks County Servs., Inc. v. PPA , 104 A.3d 604 (Pa. Cmwlth. 2014) (Bucks County II ). In 2015, the trial court permitted appellees to amend their Amended Petition for Review to amend Count IV, which had been dismissed in Bucks County I . These rulings are not challenged in this appeal.

The Pennsylvania Uniformity Clause provides "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Pa. Const. Art. VIII, § 1. Equal protection claims arise from Article III, Section 32 of the Pennsylvania Constitution, which provides, in relevant part: "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law[.]" Pa. Const. Art. III, § 32. The court did not reach appellees' Uniformity Clause or equal protection claims because, as explained further infra , it concluded the Jurisdictional Agreement violated appellees substantive due process rights. Bucks County Servs. Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 48 n.18.

Sections 1017.4(a) and (b) provide a taxicab shall not be eligible to enter service if it has more than 135,000 miles on the odometer and a taxicab shall be removed from service upon reaching an age of 8 years old or upon reaching 250,000 cumulative miles. 52 Pa. Code § 1017.4(a), and (b).

Section 1017.2 provides a vehicle may not perform taxicab service without a taxi and limousine division (TLD) inspection sticker as provided in Section 1017.32. 52 Pa. Code § 1017.2. Section 1017.31 requires every taxicab to submit to at least two scheduled inspections by PPA on an annual basis. 52 Pa. Code § 1017.31. Section 1017.32(d) provides only PPA may conduct state inspections and affix TLD inspection stickers. 52 Pa. Code § 1017.32(d). Section 1017.5(b)(12) provides a taxicab must be equipped with a protective shield which separates the front seat from the back seat. 52 Pa. Code § 1017.5(b)(12). Section 1017.21(b) requires that all meters be inspected by PPA prior to use, meters must be sealed after inspections, and if a meter seal is broken the vehicle must be taken out of service and the meter re-inspected. 52 Pa. Code § 1017.21(b).

Section 1021.2 permits only certified drivers to drive taxicabs. 52 Pa. Code § 1021.2. Section 1021.4(3) requires an applicant have satisfactorily completed taxicab driver training and testing. 52 Pa. Code § 1021.4(3). Section 1021.4(7) provides an applicant is not eligible for certification if his license has been suspended, revoked or otherwise invalidated within the past six months. 52 Pa. Code § 1021.4(7). Section 1021.7 provides an applicant shall attend an in-class training program. 52 Pa. Code. § 1021.7. Section 1017.8 lists the areas addressed in driver training. 52 Pa. Code § 1017.8. Section 1017.9 requires applicants to take and pass a certification test. 52 Pa. Code § 1017.9.

Section 1003.32 provides upon observation of a condition creating a public safety concern PPA may place the taxicab out-of-service. 52 Pa. Code § 1003.32. Section 1011.3 provides a taxicab driver certificate expires one year after issuance and requires a driver to complete renewal forms annually. 52 Pa. Code § 1011.3.

The trial court entered judgment in favor of PPA on Count II. Appellees have not appealed this decision.

On day two of the trial, the court asked the parties to stipulate to a series of statements made by the court. The parties agreed, inter alia : (1) a PUC-certificated taxicab may pick up a passenger in its PUC territory and drop off the passenger in Philadelphia, Notes of Testimony dated 10/15/2015, at 279-80, 288; (2) a partial rights taxicab may pick up a passenger either by call or demand in its Philadelphia territory, Id. at 282-83, 289, 296; and (3) a PUC-certificated taxicab may pick up in Philadelphia if the call is received by telephone and drop off is in its PUC territory, Id. at 297.

As part of the annual renewal process, partial rights taxicab operators are required to file a Form PR-1 with PPA to ensure compliance with applicable statutes and regulations. See 52 Pa. Code § 1011.3(c).

The trial court also concluded PUC's arguments that appellees' challenge to the Jurisdictional Agreement were barred by: (1) laches; (2) equitable estoppel; (3) failure to exhaust their remedy at law; and (4) collateral estoppel were without merit because PUC failed to acknowledge Count IV relates to how the Jurisdictional Agreement has been applied in relation to PPA's regulations, which would not have been an issue at the time PUC approved and published the Jurisdictional Agreement in the Pennsylvania Bulletin. The trial court also concluded PUC's argument appellees failed to exhaust administrative remedies was without merit because it assumed appellees raised a facial challenge to the Jurisdictional Agreement. The trial court rejected PUC's assertion collateral estoppel based upon dismissal of Count III also barred Count IV because Count IV challenged the Jurisdictional Agreement on an as-applied basis. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 48 n.19. We need not reach these additional rulings by the Commonwealth Court because we dispose of the appeal on other grounds.

Appellees alleged the 2011 regulations were invalid because: (1) they were not promulgated within PPA's statutory authority and (2) they violated their substantive due process rights. The Commonwealth Court did not reach the question of whether the 2011 regulations violated appellees' substantive due process rights -- an analysis which asks whether the regulations are rationally related to a legitimate government interest and balances the rights of the individual against the public interest. Khan , 842 A.2d at 946-47.

In Tire Jockey , a tire processing facility challenged a determination by the Department of Environmental Protection (DEP) that the facility's used tire accumulations did not meet the exception to the definition of solid waste set forth in DEP regulations, and thus required the facility to comply with the permitting regulations governing solid waste management. This Court examined the language of the Solid Waste Management Act, 35 P.S. §§ 6018.101 - 6018.1003 (SWMA), and DEP's Residual Waste Regulations, 25 Pa. Code §§ 287.1 - 299.232, to decide whether the DEP's interpretation of the applicable regulations was reasonable; the Court explained that promulgation of an unreasonable regulation or an unreasonable interpretation of a regulation exceeds an administrative agency's authority. 915 A.2d at 1186-87.
As correctly observed by Justice Wecht in his concurring opinion, Tire Jockey sets forth a two layer test. Concurring Opinion, op., at 240. The first layer determines "(1) whether the interpretation of the regulation is erroneous or inconsistent with the regulation, and (2) whether the regulation is consistent with the statute under which it was promulgated." 915 A.2d at 1186. The second layer determines whether an agency's promulgation of a regulation pursuant to its legislative rule-making power, as opposed to its interpretative rule-making power, was (1) within the agency's granted power, (2) issued pursuant to proper procedure, and (3) reasonable. Id. Thus, because appellees did not challenge PPA's interpretation of its regulations, but rather asserted the regulations were unreasonable, both the Commonwealth Court's analysis and this Court's analysis address only the second layer of the Tire Jockey test.

After PPA filed its post-trial motion, the court issued an order directing appellees and PUC to file answers but specifically directing the parties "shall not" file briefs. PUC filed an answer as directed and in the answer joined PPA's post-trial motion in addition to articulating various errors it claimed were committed by the court, thus properly preserving its grounds for appeal. The court recognized PUC's joinder in PPA's post-trial motion. Bucks County Servis., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Jan. 3, 2017), slip op. at 1 n.1.

The trial court invalidated these regulations: (1) vehicle age and mileage limitations, 52 Pa. Code § 1017.4 ; (2) pre-service vehicle inspections, 52 Pa. Code § 1017.2 ; (3) full Pennsylvania Department of Transportation vehicle inspections, 52 Pa. Code § 1017.32(d) ; (4) biannual vehicle inspections, 52 Pa. Code § 1017.31 ; (5) meter seal inspections, 52 Pa. Code § 1017.21(b) ; (6) vehicle partitions/protective shields, 52 Pa. Code § 1017.5(b)(12) ; (7) driver certification, 52 Pa. Code §§ 1021.2, 1021.4(3), 1021.4(7), 1021.7, 1021.8, and 1021.9; (8) out-of-service designations, 52 Pa. Code § 1003.32 ; and (9) annual renewal, 52 Pa. Code § 1011.3. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Jan. 3, 2017), slip op. at 4-5.

Section 5714(c)(2) and (3) of Act 94 provides:
(c) Service. -- A vehicle authorized by a certificate to provide call or demand service within cities of the first class may transport persons and their baggage upon call or demand and parcels, packages and property at the same basic metered rates charged to passengers:
* * *
(2) from any point in the city of the first class for which its certificate is issued to any point in this Commonwealth;
(3) from any point in this Commonwealth to any point in the city of the first class for which its certificate is issued if the request for service for such transportation is received by call to its centralized dispatch system[.]
* * *
53 P.S. § 5714(c)(2) and (3). Section 5714(d)(1)(i) and (ii) provides:
(d) Other vehicles.
(1) A vehicle which is not authorized by a certificate to provide call or demand service within cities of the first class but which is operated by the holder of a certificate of public convenience from the [PUC] authorizing call or demand service elsewhere in this Commonwealth may transport persons and property:
(i) to cities of the first class in accordance with the service authorized under its certificate of public convenience; and
(ii) from any point in a city of the first class to any point in this Commonwealth beyond that city of the first class if the request for service for such transportation is received by call to its radio dispatch service.
53 P.S. § 5714(d)(1)(i) and (ii).

PUC also argues the Commonwealth Court erred by rejecting its arguments appellees' challenges to the Jurisdictional Agreement were barred by: (1) laches; (2) equitable estoppel; (3) failure to exhaust their remedy at law; and (4) collateral estoppel. We need not address these additional arguments by PUC because, as discussed infra , we conclude the Jurisdictional Agreement does not violate appellees' substantive due process rights.

Appellees also assert because PUC failed to file a post-trial motion it has waived its right to challenge the trial court's decision on appeal. Appellee's Brief at 12. We conclude PUC did not waive its right to challenge the trial court's decision because PUC followed the trial court's explicit instructions regarding post-trial motions and in so doing joined PPA's post-trial motion. See n.16, supra .

In their Amended Complaint, appellees also alleged the Jurisdictional Agreement violates Act 94. The Commonwealth Court concluded the Jurisdictional Agreement did not violate Act 94 because Section 5714(c) granted PPA the power to regulate any taxicab operations starting or ending in the City. Bucks County Servs., Inc. v. PPA , 584 M.D. 2011 (Pa. Cmwlth. Nov. 28, 2016), slip op. at 40. Appellees do not challenge the Commonwealth Court's conclusion the Jurisdictional Agreement does not violate Act 94. Additionally, in their Amended Complaint, appellees asserted the Jurisdictional Agreement violated their right to equal protection generally and under the Uniformity Clause. The Commonwealth Court did not render a decision on appellees' equal protection claims, wherein appellees asserted the application of PPA's rules and regulations to service authorized by PUC subjects appellees to regulatory burdens not imposed on other PUC-licensed taxicabs and, therefore, the Jurisdictional Agreement violates appellees' rights to equal protection. Appellees' equal protection claims fail for the same reasons their substantive due process claims fail. The Jurisdictional Agreement does not establish dual jurisdiction, but simply allocates duties under that jurisdiction. Dual jurisdiction actually emanates from Act 94 and any equal protection violation would result from PPA's exercise of its regulatory authority under Act 94.

Act 94 defines taxicab as:
"Taxicab." A motor vehicle designed for carrying no more than eight passengers, exclusive of the driver, on a call or demand service basis and used for the transportation of persons for compensation either on:
(1) a citywide basis as authorized by a certificate of public convenience and a corresponding medallion issued by the authority; or
(2) a non-citywide basis as authorized by a certificate of public convenience issued by the authority and without a corresponding medallion.
The term includes a wheelchair-accessible taxicab.
53 Pa.C.S. § 5701.

These appellees are Concord Coach Limousine, Inc., Concord Coach USA, Dee-Dee Cab, Inc., MCT Transportation Inc., and Rosemont Taxicab Co.

Michael S. Henry, who appeared at the trial before the Commonwealth Court, is listed as counsel of record for each carrier.

Having concluded the Commonwealth Court properly considered appellees' claims under the Tire Jockey test, we need not address PPA's alternative argument appellees failed to prove a substantive due process violation.

Since these figures were entered into the record, the landscape has drastically changed regarding the value of medallions due to the explosive growth of ride sharing services, which operated illegally at times and largely unregulated for a significant amount of the time during which this matter has been pending. Partial rights taxicabs and medallion taxicabs providing service via hail or dispatch are obviously no longer the only way for people to catch a private ride. The General Assembly enacted Chapter 57A of the Parking Authorities Law, titled "Transportation Network Companies," in November 2016. See Act of November 4, 2016, P.L. 1222, No. 162, 53 Pa.C.S. §§ 57A01 - 57A22. This chapter governs ride sharing services, provides PPA has exclusive jurisdiction over service originating in the City, and authorizes PPA to promulgate regulations as it deems necessary. 53 Pa.C.S. §§ 57A03(d), 57A21(c). Whether or not a medallion is still a valuable asset is debatable, but the fact remains a medallion may be pledged as collateral.

See Tire Jockey Serv., Inc. v. Dep't of Envtl. Prot. , 591 Pa. 73, 915 A.2d 1165 (2007).

53 Pa.C.S. §§ 5701 -45.

The intertwining of due process and the "reasonableness" standard pertaining to the validity of legislative rules is discussed in the treatise on administrative law that has been consistently cited by this Court in the relevant line of cases. See 1 Kenneth C. Davis, Admin. L. Treatise § 503 (1958) ("The requirement of reasonableness stems both from the idea of constitutional due process and from the idea of statutory interpretation that legislative bodies are assumed to intend to avoid the delegation of power to act unreasonably." (emphasis added) ).
Notably, some jurisdictions have explicitly framed the last prong of the test for the validity of legislative rules in terms of compliance with constitutional requirements such as substantive due process. See, e.g. , Weyerhaeuser Co. v. State Dep't of Ecology , 86 Wash.2d 310, 545 P.2d 5, 8 (1976) (quoting 1 F. Cooper, State Admin. L. 250 (1965) ).

There has been a resurgence, in the legal commentary, of the idea that economic freedom may require more exacting judicial scrutiny. See, e.g. , Randy E. Barnett, Foreword: What's So Wicked About Lochner? , 1 N.Y.U. J. L. & Liberty 325, 333 (2005). Nevertheless, the governing precedent in Pennsylvania allocating a constrained role to the judiciary relative to legislative rules remains the same, and there is no developed argument presented here that this case should be employed as a vehicle to revamp the law.

The majority's allusion to the ineffectiveness of safety partitions appears to derive solely from conclusory testimony from a vice president of one of the cab company litigants. See N.T., Oct. 15, 2015, at 354-361. The validity of almost any regulation could regularly be called into question if courts are to accept evidence of this character as sufficient to overcome legislatively-sanctioned policymaking by regulators.
Notably, protective partitions were, for many years, mandatory in most New York City taxicabs, until 2016, when the New York City Taxi & Limousine Commission afforded the option of installing alternative safety features. See Nyc Taxi & Limousine Comm'n Rules & Local Laws § 58-35.

In various instances, Appellees did adduce evidence concerning the monetary expense associated with PPA regulations. In my judgment, however, they failed to sufficiently put those expenses into a broad enough context so as to demonstrate arbitrariness or oppressiveness. Notably, with similar broad strokes, PPA representatives testified that the regulations promote safe, clean, reliable, day-to-day transportation in the Philadelphia area. See, e.g. , N.T., Oct. 14, 2015, at 82, 104; N.T., Oct. 15, 2015, at 499, 519. Again, moreover, the presumption of validity militates in favor of Appellants, and they therefore could more comfortably rely on proofs of a less complete and concrete nature.

Even in the setting in which it applies, the hard look doctrine remains controversial. See, e.g. , Charles Alan Wright & Charles H. Koch, Jr., 33 Fed. Prac. & Proc. Judicial Review § 8414 (2018) ("Hard look review of informal rulemaking ... has prompted decades of debate regarding whether it intrudes too far into agency policymaking authority.").